**Juan C. Chavez**, OSB No.136428
**Walter Fonseca**, OSB No. 136349
**Hannah Bland**, OSB No. 252404
Oregon Justice Resource Center
PO Box 5248
Portland, OR 97208
Telephone: 503-944-2270
Facsimile: 971-275-1839

      Of Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| **JUSTIN KNAPP**,<br><br>Plaintiff,<br><br>   v.<br><br>**CITY OF PORTLAND; COREY BUDWORTH; and JUSTIN RAPHAEL,**<br><br>Defendants. | Case No. 3:26-cv-1036<br><br>COMPLAINT<br><br>Civil Rights Action (42 U.S.C. §§ 1983, 1985(3), and 1986); and State Tort (False Arrest and Negligence)<br><br>JURY TRIAL DEMANDED |

## INTRODUCTION

1. On May 25, 2024, Plaintiff Justin Knapp was illegally arrested and imprisoned by the Defendants. Contrary to the Constitution and their oaths to defend it, Defendants lied in their police reports, Grand Jury testimony, and at a Motion to Suppress hearing to prosecute the charges against Plaintiff. After Plaintiff defended himself from those charges for roughly six (6) months, a Multnomah County Circuit Court Judge held that Defendants did not have Probable Cause to stop and seize Mr. Knapp and all evidence "obtained from the stop arrest [are] fruit of

the poisonous tree."

2.      The City of Portland has known that Defendant Budworth has a criminal history but still maintained his employment as a police officer. Defendant Raphael also has a history of dishonesty. By maintaining their employment and failing to discipline these officers, Defendant City of Portland has demonstrated that they also do not wish to uphold the constitution and will maintain a pattern and practice of constitutional rights violations until they are corrected.

3.      Plaintiff suffered the indignities of false imprisonment and now brings suit against Defendants for the harm they caused.

## JURISDICTION AND VENUE

4.      This court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. § 1983, and 28 U.S.C. §§ 1331, 1343(a)(3), (4). The court has supplemental jurisdiction over the State tort claims pursuant to 28 U.S.C. § 1367(a).

5.      Venue is proper within the District of Oregon because all the events giving rise to this claim occurred in this judicial district. 28 U.S.C. § 1391(b).

## PARTIES

6.      Plaintiff Justin Knapp is a person and citizen of Oregon.

7.      Defendant Justin Raphael is at all relevant times a Police Officer with Portland Police Bureau and was acting under color of law. He is sued in his individual capacity.

8.      Defendant Corey Budworth is at all relevant times a Police Officer with Portland Police Bureau and was acting under color of law. He is sued in his individual capacity.

9.      Defendant City of Portland ("City") is a political subdivision of the State of Oregon with the capacity to sue and be sued. The City runs the Portland Police Bureau.

///

## FACTUAL ALLEGATIONS

### A.    Introduction

10.    On May 25, 2024, Plaintiff was biking south on the western sidewalk that parallels SE 82nd Ave. in Portland, OR. To avoid a pedestrian walking north towards him, and with no close car traffic, Mr. Knapp biked off the sidewalk, down a driveway, into the right-hand lane of 82nd Ave. After passing the pedestrian, Mr. Knapp rode back onto the sidewalk and continued biking.

11.    Defendants Officer Raphael and Officer Budworth ("defendant officers") were both on duty, uniformed, and in a marked Portland Police Ford Interceptor Unit ("police vehicle") heading north on SE 82nd. Officer Raphael was driving. Officer Budworth was in the front passenger seat.

12.    Defendants stopped and arrested Plaintiff, and Multnomah County District Attorney's office ("MCDA") charged Mr. Knapp with various crimes. This arrest and indictment caused Plaintiff to also receive a parole violation.

13.    After Plaintiff defended himself from those charges for roughly six (6) months, a Multnomah County Circuit Court Judge held that Defendants did not have Probable Cause to stop and seize Mr. Knapp and all evidence "obtained from the stop arrest [are] fruit of the poisonous tree."

14.    As detailed below, Defendants were aware of Plaintiff's innocence on these charges and knowingly lied to secure an indictment. Despite the obviousness of their lies, Defendants continued to allow for the prosecution of the claims against Plaintiff. Defendants did not seek the obvious and available surveillance footage that contradicted their police reports, probable cause affidavits, and grand jury testimony.

15.    MCDA routinely runs cover for the Portland Police Bureau despite obvious officer

misconduct. MCDA has a clear conflict of interest when investigating these cases, but does so nonetheless. In addition to being a clear conflict of interest, MCDA knowingly absolves PPB officers of criminal behavior knowing that it will aid the Defendant City of Portland in civil proceedings. Here, as in other cases, MCDA misrepresented facts to Grand Jurors, and did not seek readily available evidence when it would be inconvenient for the criminal prosecution or impugn the officer. Unfortunately for the public, MCDA deputies are typically afforded absolute civil immunity. The MCDA office would be a defendant in this case otherwise. Because Defendant City of Portland is aware of these problems with this system of accountability and leverage it, MCDA remains a piece of the Defendant City of Portland's pattern and practice.

16.     Defendant City of Portland failed to correct these two officers and ratified their behavior.

### B.     Defendant Officers' Accounts

17.     Defendant Officer Raphael has provided at least four accounts of the initial contact with Plaintiff in explaining why they had probable cause to initiate a stop of Plaintiff.

18.     In his police report, probable cause affidavit, and grand jury testimony, he testified in essence with some variation that Plaintiff was riding his bicycle "basically in the dead center" of the southbound lanes without signaling.

19.     This conduct, and the stop, occurred in an area captured by conspicuously located surveillance cameras. Defendants did not seek this surveillance footage. It is well known among investigators that commercial property surveillance equipment does not retain footage for very long. While Defendants had not sought surveillance footage, Plaintiff's criminal defense did. The video, as described below, told a different story.

20.     After having seen the surveillance footage, Defendant Raphael's story changed. In the motion suppress hearing, he testified as to having witnessed Plaintiff go from the street lane to

sidewalk.

21.     Defendant Budworth provided two accounts of what occurred. In his report, he wrote that Plaintiff was swerving between lanes. In grand jury, he testified that in addition to swerving between lanes, Plaintiff jumped the curb then swerved across all lanes.

22.     The Defendant Officers decided to stop Plaintiff. They wrote in their report that they did a U-Turn and turned on their emergency lights.

23.     Defendant Officers swerved in front of Plaintiff, as further described below.

24.     Defendant Raphael wrote in his report, written the same day as the incident, that "Budworth and I simultaneously exited our [police vehicle] in order to apprehend [Plaintiff] with Ofc. Budworth encountering him as I rounded the front of our [police vehicle]. When I was rounding the front of our [police vehicle] I watched as [Plaintiff] bull rushed Ofc. Budworth, clearly attempting to assault him. [Plaintiff] had ample opportunity and avenue to flee in a different direction, which he chose not to do. [Plaintiff] lowered his center of gravity into an athletic position as he reached Ofc. Budworth, throwing Ofc. Budworth to the ground. Prior to reaching this violent scene [Plaintiff] had already sprung to his feet and begun to sprint eastbound across SE 82nd."

25.     A few days later, in his probable cause affidavit, he wrote, Plaintiff "soon crashed his bike in the parking lot […] and started to run from the bike. As he did this Ofc. Budworth was attempting to confront him and I watched as [Plaintiff] bull rushed Ofc. Budworth, knocking him to the ground."

26.     In Grand Jury testimony on May 30, 2024, he testified that as he exited the police vehicle, he "round[ed] the front" of their police vehicle, and was looking towards where he last saw Plaintiff and he "acquire[ed] this chaotic scene" which he described as Plaintiff "attacking

Officer Budworth." He went on to describe how Plaintiff took "an athletic stance," "based out," "lowered his center of gravity," and sprinted toward Officer Budworth, "clearly trying to take the fight to Officer Budworth."

27. Defendant Raphael told the Grand Jury that he saw part of Defendant Budworth's bone sticking out through his skin after Plaintiff "bull rushed" Defendant Budworth.

28. During the Motion to Suppress Hearing on August 12, 2024, on direct examination, the MCDA Deputy District Attorney ("DDA") did not ask Defendant Raphael to describe this incident but instead had him review the video. During this questioning, Defendant Raphael agreed that Defendant Budworth "was pushed and knocked down." However, on Cross-Examination counsel confronted him with his earlier accounts that were inconsistent with the facts, including that he rounded the front of the police vehicle. Defendant Raphael stated he was certain he rounded the front of the police vehicle "and when I saw this video for the first time, I realized I hadn't. […] I was convinced that I went one way and made a U-turn, but you see in the video I get out and go one way. I was convinced that I ran one way, but without going into kind of the science of inadvertent sensory disruption and how it can change some of our perception in these dynamic moments, that's exactly what happened to me. So I just remember seeing the encounter occur and what I was doing was looking at it you know out of our [police vehicle] as it occurs, not outside of it, basically." He further admitted his "memory" of what he observed "may have been different from what actually occurred."

29. In Defendant Budworth's police report he stated, "[Defendant Raphael] stopped in front of the subject in the IHOP parking and the subject slammed on the breaks, flipped over the handlebars and began to stand up, clearly preparing to foot bail. Officer Raphael stopped on the curb line of the entrance as I exited the patrol vehicle to challenge the subject. The subject ran

directly towards me and I attempted to take him down to the ground. I placed my hands on his chest and the subject bull rushed me in what I perceived to be a tactic to get away from my attempt at controlling him. This bull rush caused me to pivot on my right ankle immediately snapping it and I fell to the ground."

30.    In Grand Jury testimony on May 30, 2024, Defendant Budworth testified "I got out of the passenger seat and by the time I got out of the passenger seat to open up the door. He was already up, facing me, I told him to stop he was under arrest. He ran directly right at me, he bull rushed me. I tried to grab his shirt, his hands, his shirt or like his clothing to take him down as he was running towards me. But his momentum and my momentum backing up we spun to the right and my ankle just decided to stay straight as we rolled to the right. Immediately heard this pop and like a fumble in a football game, immediately let go of him. And I just collapsed to the ground."

### C.    What Actually Happened

31.    On Memorial Day weekend 2024, Plaintiff was biking down SE 82nd Ave. in Portland, OR on his way to his grandma's house.

32.    Security camera video of the above-described incident shows a pedestrian walking north on the western sidewalk parallel to SE 82nd Ave.



33.    The same video shows plaintiff appearing (near the top center of the screen) as he bikes south towards the pedestrian and exits the sidewalk down a driveway.



34.    Plaintiff bikes into the right-hand land of SE 82nd Ave, with no close car traffic, passing the pedestrian.





35.    Plaintiff quickly re-enters the sidewalk up a driveway. This entire incident occurred in roughly eight (8) seconds.

36.    The video evidence shows that all of Defendants' accounts of Plaintiff's actions described above are fabrications. The only account that accords somewhat with the facts is Officer Raphael's account after having seen the video.

37.    Despite no active emergency or other vehicles being endangered, Defendants decided to perform a dangerous and unreasonable maneuver that injured Plaintiff.

38.     Security camera video looking south on SE 82nd Ave. shows Defendants' police vehicle heading north. Roughly six (6) seconds later Plaintiff is seen biking south on the sidewalk. About five (5) seconds after that, Defendants' police vehicle heads south without any emergency lights on, until both parties are blocked from view.

39.     Plaintiff continued to ride his bike away from defendants for several blocks until he nears a driveway entrance to another business along SE 82nd Ave.

40.     Security camera video shows Defendants dangerously swerve onto the sidewalk, causing plaintiff to go into a grassy area and hit a curb. Plaintiff flew over his handlebars, off his bicycle, and into the driveway entrance just as a motorcycle officer and Defendants' police vehicle pulled in.

41.     Defendant Budworth is closest to plaintiff on the passenger side.

42.     Plaintiff quickly recovered after he crashed, and at almost the same time Officer Budworth opened his door. Officer Budworth then stumbles as he gets out of his vehicle and falls to the ground towards Plaintiff.

43.     Plaintiff moves eastward, away from another officer to his southwest, towards the falling Defendant Budworth. Plaintiff appears to have outstretched his arms and sidestepped the falling defendant Budworth.

44.     Defendant Budworth did not sustain an injury where his bone was sticking out through his skin. Defendant Raphael knowingly aggrandized the injury for the Grand Jury.

45.     This video also shows Defendant Raphael exiting and rounding the back of the police vehicle.

46.     Plaintiff was arrested and charged with several counts, including Assault in the Second Degree, Assaulting a Public Safety Officer, Escape in the Third Degree, and Interfering with a

Peace Officer.

47.     Plaintiff was not charged or cited with any traffic crimes, which was the putative the reason Defendant Officers' alleged they had probable cause to initiate the seizure of Plaintiff and the reason which set in motion this entire chain of events. No police report ever mentions which specific traffic laws Defendants Raphael and Budworth alleged Plaintiff violated.

### D.    Lack of Probable Cause and Dismissal of Charges

48.     Plaintiff's defense counsel sought videos of the incident. Plaintiff's counsel learned that the Portland Police Bureau officers had not sought these videos. As is commonly known among investigators, had the videos not been sought within a two-week timeframe, they likely would have been deleted, leaving only the officer accounts supporting the prosecution's case.

49.     After reviewing the videos of the evidence, Plaintiff's legal team moved to suppress the evidence gathered in the case.

50.     Only Defendant Raphael and MCDA DDA Shull submitted Probable Cause Affidavits. Defendant Raphael's affidavit, detailed above, varies in legally significant details from what objective evidence shows regarding Defendants Officers' Probable Cause to seize Plaintiff. DDA Shull's affidavit was based on his review of the police reports and it appears he conducted no other review of the facts of the case. He described the reason for the initial stop as "Officer Raphael observed the defendant southbound on 82nd Ave on a bicycle, swerving between the southbound lanes without signaling…" This is, at best, a misrepresentation of the actual facts.

51.     Neither affidavit identifies which laws Defendant Officers' alleged Plaintiff violated while biking, the very premise for their Probable Cause to initiate the stop of Plaintiff.

52.     MCDA presented several previously undisclosed theories as to why Probable Cause existed for the initial stop. They included arguing a sidewalk is a "lane" within the meaning of

relevant Oregon traffic laws, that Plaintiff failed to signal turns between lanes, and that he failed to yield to the pedestrian on the sidewalk.

53.    On September 12, 2024, Multnomah County Circuit Court Judge Bottomly held Defendants lacked Probable Cause for the initial stop. The Court found that the "sidewalk is not a 'lane,' that [Plaintiff] did not execute a 'turn,' and, that any subjective belief by Officer Raphael that [Plaintiff] violated the statute pertaining to yielding to a pedestrian on a sidewalk is not reasonable given what the video plainly shows."

54.    The Court also analyzed whether the alleged "assault" on Officer Budworth could provide Probable Cause, assuming without deciding that it was sufficiently attenuated from the initial stop. The Court found Officer Raphael's account "[could not] be relied upon…"

55.    Even after the suppression ruling, MCDA did not dismiss until March 7, 2025, some six (6) months later.

**E.    Defendant City of Portland's Deliberate Indifference**

56.    As described above, Defendant City of Portland works with the MCDA to secure "no true bills" from Multnomah County grand juries to cover up officer misconduct.

57.    They do so by inserting themselves into criminal investigations of their own officers, by failing to do basic investigatory tasks like collecting video, and by testifying on each other's behalf at the grand jury stage.

58.    In 2021, Defendant Budworth almost benefited from system, but a grand jury chose to indict him for committing an assault on an unarmed photographer at a protest.

59.    In July of 2020, Portlanders were still marching in support of the Black Lives Matter movement following the murder of George Floyd in Minneapolis, MN. Ms. Teri Jacobs had been photographing the protests. Defendant Budworth was caught on video chasing Ms. Jacobs before

bashing her in the head with his baton, knocking her to the ground face first. As she began crawling away on all fours, Defendant Budworth bashed her again in the face as she showed him her press badge.

60.    Despite the obviousness of the misconduct and the clear conflict of interest, MCDA decided to use PPB Officers to opine to the grand jury as to whether Defendant Budworth was within policy. PPB Officer and Baton Trainer Derek Harris testified that Defendant Budworth acted within policy.

61.    The grand jury disagreed and indicted Defendant Budworth.

62.    Defendant Budworth's charges were dismissed after he recorded a video apologizing to Ms. Jacobs.

63.    Despite clear misconduct, Defendant City of Portland has continued to employ him and defend his actions. Defendant Budworth only received a Letter of Reprimand for committing a criminal assault.

64.    Defendant Budworth is awaiting promotion to sergeant.

65.    On May 22, 2026, Oregon's Department of Public Safety Standards and Training voted to allow Defendant Budworth to keep his police certification. PPB Chief of Police Bob Day and MCDA Nathan Vasquez wrote to DPSST in support of Defendant Budworth retaining his certification, further ratifying his behavior.

66.    Defendant Raphael also has a history of dishonesty and violence.

67.    Defendant Raphael shot and killed Koben Henriksen with his AR-15. Mr. Henriksen was an unhoused man living with mental illness. Defendant Raphael's partner had a less lethal weapon, which he used. But because Defendant Raphael used his lethal weapon, any value of a less lethal weapon was negated. Defendant Raphael shot Henriksen three times, twice in the

torso and once in the head.

68.     Defendant Raphael was not disciplined or fired for actively escalating the encounter by immediately aiming a high-powered lethal rifle and shouting voice commands, and for failing to use of less than lethal force when that was readily available, resulting in Mr. Henriksen's death.

69.     In January 2026, an internal investigation found that Defendant Raphael, while working at the rank of officer, had utilized unauthorized supervisor access to the timekeeping system and approved his own Paid Time Off ("PTO") requests on forty-one occasions, hired himself for fourteen overtime shifts, and adjusted his and a colleague's training schedules. In several instances, these changes reduced staffing below the maximum number of personnel permitted to be on Discretionary Leave for the workday. He only received a 120-hour suspension.

70.     Defendant City of Portland does not track how or how often its officers conduct result in motions to suppress being granted. Doing so would instill accountability and constitutional policing. Failing to do so results in what happened to Plaintiff.

71.     Defendant City of Portland has continually failed to rein in its officers either through discipline or training, effectively ratifying their behavior and granting them impunity for their actions. This failure and the deliberate indifference to the failure placed Plaintiff into the path of two troublesome officers, becoming the moving force of Plaintiff's constitutional rights being violated.

### F.     Plaintiff's Injuries

72.     Because Plaintiff was arrested without probable cause he spent approximately 180 days in jail.

73.     At the time he was arrested, Plaintiff's daughter was less than a week old.

74.     Because of this incident, plaintiff missed the first six (6) months of his newborn

daughter's life.

75.     He suffered physical pain from the unreasonable stop and seizure, and emotionally from the entire ordeal.

**FIRST CLAIM FOR RELIEF**

**(Fourth and Fourteenth Amendments—Unlawful Search and Seizure—42 U.S.C. § 1983)**
**(Against Defendants Raphael and Budworth)**

76.     Plaintiff realleges the above paragraphs as if fully restated here.

77.     42 U.S.C. § 1983 provides that a party shall be liable when it "subjects, or causes to be subjected, any person of the United States ... deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States."

78.     Defendants Raphael and Budworth violated Plaintiff's right to be free from unreasonable searches and seizures, guaranteed by the Fourth and Fourteenth Amendment to the United States Constitution, by unlawfully initiating a stop of Plaintiff and subsequently arresting Plaintiff and unlawfully searching his person and his possessions without probable cause as described above.

79.     The actions of Defendants Raphael and Budworth, as described in this complaint, were embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted upon Plaintiff. As a result of said intentional conduct, Plaintiff is entitled to punitive damages against Defendants Raphael and Budworth, in their individual capacities, in an amount sufficient to punish them and to deter others from like conduct.

80.     The unreasonable seizure of Plaintiff was the direct and proximate cause of his bodily injury, pain, suffering, loss of liberty, mental and emotional suffering, worry, fear, anguish, and shock. Plaintiff claims all of his damages in an amount to be ascertained according to proof at trial and attorney's fees.

///

**SECOND CLAIM FOR RELIEF**

**(Fourteenth Amendment—Due Process, Fabrication of Evidence —42 U.S.C. § 1983)**
**(Against Defendants Raphael and Budworth)**

81.    Plaintiff realleges the above paragraphs as if fully restated here.

82.    The Due Process clause of the Fourteenth Amendment protects persons from being subjected to criminal charges on the basis of false evidence that was deliberately fabricated.

83.    Defendants Raphael and Budworth deliberately fabricated evidence that was used as a pretense to initiate a stop and arrest of Plaintiff, or at a minimum was deliberately indifferent to the fact that Plaintiff's conduct of riding his bike did not constitute a crime, or that Plaintiff did not "bull rush" Defendant Budworth when in fact he fell on his own.

84.    Because of their conduct, Defendant Officers violated Plaintiff's clearly established due process rights.

85.    The actions of Defendants Raphael and Budworth, as described in this complaint, were embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted upon Plaintiff. This is further evinced by the furtive acts of Defendants to not seek the obviously available video surveillance footage, and by the aggrandized statements made in different legal fora to justify their actions. As a result of said intentional conduct, Plaintiff is entitled to punitive damages against Defendants Raphael and Budworth, in their individual capacities, in an amount sufficient to punish them and to deter others from like conduct.

86.    The fabrication of evidence or deliberate indifference to the facts, was the direct and proximate cause of bodily injury, pain, suffering, loss of liberty, mental and emotional suffering, worry, fear, anguish, and shock. Plaintiff claims all of his damages in an amount to be ascertained according to proof at trial and attorney's fees.

///

## THIRD CLAIM FOR RELIEF

### (Conspiracy to Violate Rights – 42 U.S.C. §§ 1985(3), 1986)
### (Against Defendants Raphael and Budworth)

87.     Plaintiff realleges the above paragraphs as if fully restated here.

88.     Pursuant to 42 U.S.C § 1985(3), people in the United States may seek damages against two or more persons who have conspired to deprive them of having and exercising any right or privilege of a citizen of the United States.

89.     Pursuant to 42 U.S.C. § 1986, people in the United States may seek legal redress against individuals whom have knowledge of the conspiratorial acts to deprive a person of their civil rights that are about to be committed, have the power to prevent or aid in preventing the acts from happening, but neglects or refuses to stop it. If the conspiratorial acts are committed, the defendants shall be liable to the party injured for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented.

90.     As described above, Defendants Raphael and Budworth's agreement, while acting under color of law, to search and seize Plaintiff without Probable Cause violated his right to free from state interference with his liberty.

91.     This conspiracy was the direct and proximate cause of bodily injury, pain, suffering, loss of liberty, mental and emotional suffering, worry, fear, anguish, and shock. Plaintiff claims all of his damages in an amount to be ascertained according to proof at trial and attorney's fees.

## FOURTH CLAIM FOR RELIEF

### (*Monell* Liability — 42 U.S.C. § 1983)
### (Against Defendant City of Portland)

92.     Plaintiff realleges the above paragraphs as if fully restated here.

93.     As described in Claims 1 to 3, Defendants Budworth and Raphael felt immune to

accountability and constitutional policing. This conduct comes from an entrenched culture of impunity at the Portland Police Bureau.

94.     Defendants Raphael and Budworth's conduct illustrates a pattern and practice of Defendant City of Portland in failing to train, supervise, and discipline its officers to ensure that they follow the constitution. Defendant City of Portland also does not track when or how officers conduct results in a motion to suppress, including when the officer's testimony is deemed unreliable by a judge.

95.     The unreasonable seizure and fabrication of evidence against Plaintiff was the direct and proximate cause of his bodily injury, pain, suffering, loss of liberty, mental and emotional suffering, expenses, worry, fear, anguish, shock, anxiety, and nervousness. Plaintiff claims all of his damages in an amount to be ascertained according to proof at trial.

## FIFTH CLAIM FOR RELIEF

### (False Imprisonment - State Law)
### (Against Defendant City of Portland)

96.     Plaintiff realleges the above paragraphs as if fully restated here.

97.     Defendants Raphael and Budworth were acting as agents of the City of Portland.

98.     Plaintiff provided a timely tort claim notice to the Defendant City of Portland.

99.     As described above, defendants intentionally and unlawfully restrained, stopped, searched, arrested, and had imprisoned Plaintiff.

100.    Plaintiff was falsely imprisoned from the date of his arrest, May 25, 2024, to November 21, 2024.

101.    This intentional conduct was the direct and proximate cause of plaintiff's bodily injury, pain, suffering, loss of liberty, mental and emotional suffering, worry, fear, anguish, and shock. Plaintiff claims all of his damages in an amount to be ascertained according to proof at trial.

## FIFTH CLAIM FOR RELIEF

### (Negligence - State Law)
### (Against Defendant City of Portland)

102.    Plaintiff realleges the above paragraphs as if fully restated here.

103.    As alleged above, because the City of Portland failed to train and discipline its officers, including Defendants Raphael and Budworth, it was foreseeable that Defendants Raphael and Budworth would engage in an unreasonable practices like driving their vehicles into a bicyclist causing them to fly over his handlebars and fabricating evidence.

104.    Independently, while acting as agents of the Defendant City of Portland, it was foreseeable that the actions taken by Defendants Raphael and Budworth of driving their vehicle into a bicyclist would cause the bicyclist to fly over their handlebars.

105.    Defendant City of Portland owed a duty to Plaintiff to not engage in such unreasonable behavior.

106.    In taking the actions described above, Defendant City of Portland breached their duty to the Plaintiff, causing him injury.

107.    This negligent conduct was the direct and proximate cause of plaintiff's bodily injury, pain, suffering, loss of liberty, mental and emotional suffering, worry, fear, anguish, and shock. Plaintiff claims all of his damages in an amount to be ascertained according to proof at trial.

### REASONABLE ATTORNEY'S FEES AND COSTS

108.    42 U.S.C. § 1988(b) allows "the prevailing party… a reasonable attorney's fee as part of the costs…" in an action brought under 42 U.S.C. §§ 1983, 1985, and 1986.

109.    Plaintiff requests that the Court grant a reasonable attorney's fee in this action.

### CONCLUSION

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

A.       For economic and non-economic damages in an amount to be determined at trial;

B.       For reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

C.       Such other relief as the court deems just and proper.

DATED: May 25, 2026.

*/s/ Juan C. Chavez*
Juan C. Chavez, OSB #136428
PO Box 5248
Portland, OR 97208

*ATTORNEY TO BE NOTICED*
